IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Kristen Galban, | ) |
| Plaintiff, | ) |
| | ) Case No. 22-cv-4917 |
| v. | ) |
| | ) Judge Joan B. Gottschall |
| Institute for the International Education of Students, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kristen Galban ("Galban"), then an undergraduate student at the University of Virginia, contracted with defendant International Association for the Education of Students ("IES Abroad") to participate in a semester-long study abroad program in Vienna, Austria, during the Spring of 2020. *See* Am. Compl. ¶¶ 2–6. The outbreak of the COVID-19 pandemic cut IES Abroad's programs short. On March 11, 2020, IES Abroad cancelled the remainder of the semester and told students to return to their home countries, where they completed their courses via online learning platforms. *See* Am. Compl. ¶ 3, 41–43. Seeking a partial refund of her tuition and costs, Galban brings claims on behalf of a proposed class against IES Abroad for breach of contract and, alternatively, unjust enrichment. Am. Compl. ¶¶ 47–79.

IES Abroad moves to dismiss Galban's amended complaint, arguing that she lacks standing to sue under Article III of the Constitution and that her amended complaint fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6). For the following reasons, the court concludes that Galban has standing to sue, but a clause in the parties' written agreement reserving to IES Abroad the right to change the study abroad program prevents Galban from recovering.

## I. Background

Except where stated otherwise, the following facts are drawn from Galban's amended complaint. IES Abroad "is a private sector international study abroad program provider that partners with U.S. colleges and universities to provide study abroad programs in over

81 locations around the world." Am. Compl. ¶ 11. In 2020, Galban was an undergraduate student studying statistics and physics at the University of Virginia. Am. Compl. ¶ 31. She graduated in 2021. *Id*.

For the Spring 2020 semester, IES Abroad charged a variable program fee depending on the program the student selected. *See* Am. Compl. ¶ 14. The program fee consisted of separate charges for tuition, housing and meals, and health insurance. *See id.* (table of fees charged); *see also* Am. Compl. ¶ 29.

IES Abroad used standard form contracts with all of its Spring 2020 students: each student filled blanks in the standard form for the student's name, address, and program location. Am. Compl. ¶¶ 22, 25. Galban signed one of these form contracts ("the agreement"), thereby forming a contract with IES Abroad to participate in its Spring 2020 Vienna - European Society & Culture program. Am. Compl. ¶ 26; *see also* Agreement, Am. Compl. Ex. A. ECF 33-1. Galban, or someone on her behalf, paid the following tuition and fees: "(1) $3,900.00 for Housing and Meals while abroad in Vienna, Austria; (2) $16,630.00 for Tuition (which includes mandatory field trips and student events in the host country and nearby countries); and (3) $82.65 for a Public Transportation Ticket to be used during the all [sic] 17 weeks." Am. Compl. ¶ 62.

In count I, Galban brings a breach of implied contract claim on behalf of herself and the proposed class. Am. Compl. ¶¶ 56–68. Pleading in the alternative, she asserts a claim for unjust enrichment in count II. Am. Compl. ¶¶ 70–78.

Much of the dispute here centers on the terms of the parties' contract. Paragraph 59 of the amended complaint encapsulates Galban's position: "Galban and members of the Class entered into standard form Agreements with IES Abroad which incorporate by reference Defendant IES Abroad's marketing, brochures, circulars, and publications for its 2020 Spring Study Abroad Programs, which are collectively the terms of the Contract between IES Abroad and its students." Am. Compl. ¶ 59. IES Abroad contends that its standard form agreements do

not incorporate its marketing materials and other publications and that it did not breach the terms of its written agreement with Galban. This issue is discussed in Part III, *infra*.

To illustrate, Galban included in the amended complaint several examples of the implied promises in IES Abroad's marketing materials, publications, and syllabi (collectively "program materials"). *See* Am. Compl. ¶¶ 12–22, 24. A summary of these examples, with selected quotations, follows:

- Select quotes from marketing materials from the Spring 2020 semester: "Study abroad is more than going from here to there. It's an exhilarating challenge of academic and cultural immersion, plus a whole lot of fun. . . . College study abroad is your chance to live and study in another country while earning college credit. Whether you choose to spend a semester, summer, or year studying abroad, your IES Abroad courses and experiential learning opportunities—think internships, service learning placements, field trips, and more—are designed to immerse you into the local culture. Because while studying abroad, the world is your classroom." Am. Compl. ¶ 13. (quoting IES Abroad's website).

- Excerpts of a page on IES Abroad's website entitled "What's Included," touting the benefits of IES Abroad's programs: "A big part of studying abroad is immersing yourself in new experiences. We're all about providing outstanding academic and student support services to allow you to do just that." Am. Compl. ¶ 16 (citation to website omitted). Among the programs and services highlighted by IES Abroad: "Housing reflective of student accommodations in your host city;" "Field trips, cultural events, and course-related trips;" and "our Comprehensive Orientation and Re-entry Experience programming." *Id*.

- Seen favorably to plaintiff, IES Abroad's marketing materials linked the in-person components of its study abroad program with a student's increased marketability to potential employers. *See* Am. Compl. ¶ 17. According to its marketing materials, "Most IES Abroad alumni feel that studying abroad helped them develop valuable job skills, such as language proficiency, cultural understanding, tolerance for ambiguity, adaptability, and self-confidence." *Id.* (quoting unsourced marketing material).

- Galban also points to descriptions of the Vienna, Austria program in which she enrolled. *See* Am. Compl. ¶¶ 37–38. For instance: "Vienna will be your classroom. Can you imagine learning about Freud's theories of psychoanalysis and then touring his home and the office where he practiced? Or studying politics and international organizations and visiting the UN, the OSCE, or OPEC? How about exploring art history in Vienna's world-famous galleries and museums? Welcome to study abroad! Wherever possible our courses take advantage of the city's historical, artistic, and cultural sites and include a hands-on, practical component." Am. Compl. ¶ 38.

- Substantively identical brochures and publications corresponding to each IES Abroad Spring 2020 study abroad program implied that the student would receive "a full program worth of in-person courses while in the host country, housing in the host country (even if the location of housing was changed during the program), mandatory field trips in the host country, and elective field trips in the host country." Am. Compl. ¶¶ 18–20.

- IES Abroad also posted a substantively identical syllabus for each 17-week-long study abroad program. *See* Am. Compl. ¶ 22. Students were scheduled to attend a week-long mandatory field trip between March 15–21, 2020. *Id.* The field trip did not occur because IES Abroad cancelled in-person classes on March 11. Am. Compl. ¶ 23.

Galban alleges that she enjoyed an experience "relatively consistent" with these representations during her first weeks in Vienna. Am. Compl. ¶ 41. But after in-person classes were cancelled and students began learning remotely, the program ceased to be "the study abroad program for which Plaintiff Galban contracted." Am. Compl. ¶ 43. Galban alleges that she and members of the proposed class were damaged because "they did not receive the immersive study abroad experience for which [they] contracted." Am. Compl. ¶¶ 44, 46. Galban seeks to represent a class consisting of all persons enrolled in IES Abroad's study abroad program in the Spring 2020 semester. *See* Am. Compl. ¶¶ 47–49 (citing Fed. R. Civ. P. 23(b)(2) and (b)(3)).

## II. Standing

The court must determine whether Galban has standing to sue before it can reach IES Abroad's motion to dismiss the amended complaint on the merits. *See, e.g.*, *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278–79 (7th Cir. 2020); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019). "Standing is a threshold requirement [for subject matter jurisdiction] because it derives from the Constitution's limit on federal courts' authority to resolve 'cases' and 'controversies.'" *Bazile*, 983 F.3d at 278 (citing U.S. Const. art. III, § 2, cl. 1; and *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998)). "The plaintiff, as the party invoking the court's jurisdiction, must establish the elements of standing." *Id.* (citation omitted).

To demonstrate standing,[1] "a plaintiff must show (i) that [she] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). When deciding whether a complaint establishes standing, the court "asks whether the complaint 'clearly . . . allege[s] facts demonstrating each element.'" *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1064 (7th Cir. 2020) (alterations in original) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *see also Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015).

By order dated August 31, 2023, this court dismissed Galban's original complaint for want of Article III standing, specifically Galban's failure to identify a concrete and particularized injury she in fact experienced. *See* ECF No. 32 at 3–7. "To be concrete, an injury must be real, and not abstract. Tangible harms like monetary and physical harms are the most obvious, but '[v]arious intangible harms can also be concrete.'" *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 734 (7th Cir. 2023) (internal quotation in first sentence omitted; brackets in original) (quoting *TransUnion*, 594 U.S. at 414). This court's analysis of the injury in fact requirement as it applied to the original complaint began with a recent Seventh Circuit case:

> The recent case of *Dinerstein v. Google, LLC*, rejects the proposition that a breach of contract "is itself a legally cognizable injury in fact" and holds that to have standing, the plaintiff must identify a concrete and particularized injury "beyond the breach itself." *Dinerstein v. Google, LLC*, 73 F.4th 502, 518 (7th Cir. 2023). The Seventh Circuit explained that breach of a contractual promise unaccompanied by a cognizable concrete and particularized injury in fact is "at most an injury in law, which we know from *TransUnion* 'is *not* an injury in fact.'" *Id*. at 518–19 (emphasis in original) (quoting *TransUnion,* 141 S. Ct. at 2255). To satisfy *Dinerstein*, which was issued after the parties briefed the pending motions, Galban must adequately plead a concrete and particularized injury in addition to IES's alleged breach of contract. *See id*. at 518–20. The only other well-pleaded injury in the complaint is a financial loss . . . .

---

[1] "There are 'two forms of standing challenges. A facial challenge attacks standing on the pleadings, arguing that the plaintiff lacks standing even if the well-pleaded allegations in the complaint are taken as true. A factual challenge, by contrast, asserts that there is in fact no standing.'" *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024) (quoting *Flynn v. FCA U.S. LLC*, 39 F.4th 946, 952 (7th Cir. 2022)). IES Abroad raises a facial challenge here. *See id.*

5

Order at 3–4.

But, as Galban confirmed in her briefing, she did not incur that financial loss. Instead, her parents paid the costs and tuition sought in her complaint. *See id.* at 5 (quoting Resp. to Mot. to Dismiss Orig. Compl. 16–17; other citations omitted). Based on this fact and the then-existing record, the court ruled that Galban impermissibly sought to sue based on her parents' pocketbook injuries in violation of the third-party standing doctrine. Under the third-party standing doctrine, "a party generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 4 (quoting *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 999 (7th Cir. 2011)).

Because *Dinerstein* was decided after the parties briefed the motion to dismiss the original complaint, this court granted Galban leave to file an amended complaint. *Id.* at 6–7. Galban has done so, and IES Abroad argues that she has not alleged a cognizable injury in fact. Galban still does not allege that she suffered any personal financial injuries. In her amended complaint, she advances a new theory of harm to satisfy the injury in fact requirement, namely that, as a result of IES Abroad's early cancellation of her study abroad program, she was deprived of the intangible benefits of an "immersive experience of a full semester living and studying in Vienna, Austria." Resp. to Mot. to Dismiss Am. Compl. 8, ECF No. 39. The amended complaint elaborates:

> For the remainder of the semester, she did not live in Austria where she was able to engage with Austrians on a daily basis. She did not get to eat the meals in Austria that were to be part of the Program. She did not speak or learn German on a daily basis. She did not attend classes with Austrian teachers in person along with other students. She was unable to make Austrian friends or experience the culture of Vienna first hand. [sic] She did not get to participate in field trips in Austria and surrounding countries. She did not get to study about the United Nations and then visit its offices as promised. She did not get to travel through Europe to explore the culture as part of the study abroad experience that she purchased from IES Abroad.

Am. Compl. ¶ 44.

IES Abroad contends that *Dinerstein* forecloses Galban's standing argument because it is, at bottom, a contention that IES Abroad breached its contract. In *Dinerstein*, the plaintiff sued the University of Chicago medical system over its disclosure of his medical records, under a data

6

use agreement, for use in a research project conducted by a large technology company. *See Dinerstein,* 73 F.4th at 508–09. The plaintiff filed a proposed class action on behalf of himself and other patients whose records were disclosed. He asserted several claims, including that the university breached a contractually enforceable promise to keep his medical records private and a "novel" common law tort claim for breach of medical confidentiality. *See id.* at 509, 514. The Seventh Circuit held that the plaintiff lacked standing and had not identified a concrete and particularized injury in fact. *Id.* at 512–23. The *Dinerstein* court first determined that the plaintiff had not identified a cognizable injury in fact supporting his privacy-related claims. *Id.* at 514–17. Concerning the risk that the plaintiff could be identified from the anonymized medical records, the court found this possibility to be "wholly speculative and implausible" on the record presented. *Id.* at 516.

Next, the Seventh Circuit analyzed the plaintiff's standing to sue for breach of contract. *See Dinerstein*, 73 F.4th at 516–22. First, the Seventh Circuit held that the plaintiff experienced no concrete and particularized pecuniary harm from the university's alleged breach of its contract, *i.e.*, the disclosure of his medical records to Google. Citing Seventh Circuit precedent, the court rejected the plaintiff's contentions that: (i) he paid more for his medical care than he would have if he had known that his medical records would be subject to disclosure; and (ii) the university benefited financially from the use and disclosure of his medical records. *See id.* at 517–18. In the words of the Seventh Circuit, "What's left, then, is Dinerstein's argument that a breach of contract is itself a legally cognizable injury in fact." *Id.* at 518.

The plaintiff argued that "an allegation of a breach of contract is enough, without more, to support Article III standing." *Id*. The Seventh Circuit held to the contrary, citing the Supreme Court's decisions in *Spokeo; TransUnion;* and *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020). *See id.* at 518–22. The *Dinerstein* court wound up its analysis with the following holding: "As we read *Thole*, *TransUnion*, and *Spokeo*, a breach of contract alone—without any actual harm—is purely an injury in law, not an injury in fact. And it therefore falls short of the Article III requirements for a suit in federal court." *Id.* at 522. Put slightly differently, under *Dinerstein*, a

7

plaintiff must identify a breach of contract (an injury in law) plus some concrete and particularized injury in fact supporting standing. *See id.*

*Dinerstein* does not foreclose Galban's standing arguments. *Dinerstein* teaches that Galban's allegation that IES Abroad breached its contract does not, without more, plead a concrete and particularized injury in fact. *See Dinerstein*, 73 F.4th at 518–22. But further analysis is needed. As with the privacy interests and pecuniary harms analyzed at length in *Dinerstein*, this court must ask whether the harm Galban identifies rises to the level of a concrete and particularized injury, regardless of whether or not a breach of contract accompanied it. *See id.*, at 514–18.

Under *Dinerstein*, then, the question is whether Galban's alleged injury–the deprivation of eight-and-a half weeks of an immersive educational study abroad experience in a foreign country and the substitution of an allegedly inferior, remote online learning experience–qualifies as a concrete and particularized injury in fact. The parties cite no case directly answering this question. Nor do they cite any case applying standing doctrine to a claimed deprivation of an educational opportunity.

In *Gratz v. Bollinger*, 539 U.S. 244, 263–64 (2003), the Supreme Court held squarely that the plaintiff, who was denied admission to a university, had standing to challenge the university's use of race in admissions decisions. By the time the lawsuit reached the High Court, the student plaintiff had matriculated to another school, but he signed an affidavit stating that he stood ready and willing to transfer to his preferred school if it ceased using race in its admissions decisions. *Id*. at 263. That sufficed to show that he had suffered an injury in fact. *Id*.

As *Gratz* demonstrates, standing doctrine treats participation in educational programs as unique, discrete opportunities to learn at a particular time and place, enriched by the particular group of peers, teachers, and institutional opportunities offered to the student. Thus, a plaintiff who alleges a deprivation of the chance to participate in such a discrete learning opportunity or program (whether the alleged right to participate emanates from the Constitution, from a statute, or from a contract) pleads a judicially cognizable injury in fact. *See Students for Fair*

8

*Admissions, Inc. v. President & Fellows of Harv. Coll. (Harv. Corp.)*, 261 F.Supp.3d 99, 109–10 (D. Mass. 2017), *aff'd sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 980 F.3d 157 (1st Cir. 2020), *aff'd* in relevant part*, rev'd* on other grounds*,* 600 U.S. 181, 199 (2023).[2]

Applying this principle to the instant case, Galban adequately alleges a concrete and particularized injury in fact, that is, the loss of her chance to participate in the last eight-and-a-half weeks of a unique and discretely identifiable educational experience in the form of an in-person study abroad program. Because the traceability and redressability elements of standing are not contested and because each element is adequately alleged in the amended complaint, IES Abroad's motion to dismiss for lack of standing is denied.

### III. Failure to State a Claim

On the merits, IES Abroad contends that the amended complaint fails to state a breach of implied contract claim because its written contract superseded any contractually enforceable promises implied by its website and marketing material. *See* Mem. Supp. Mot. to Dismiss Am. Compl. 12–18, ECF No. 36. The written agreement, IES Abroad argues, authorized it to change the program's itinerary and contained a "no refund" clause, both of which preclude Galban from recovering. *See id*. For similar reasons, IES Abroad also maintains that its written agreement with Galban precludes her from recovering on an unjust enrichment theory. *See id*. at 18–20.

#### A. Rule 12(b)(6) Standard

IES Abroad's Federal Rule of Civil Procedure 12(b)(6) motion tests the amended complaint's sufficiency under federal pleading standards, not the merits of her case.[3] *See*

---

[2] *See also Gratz*, 539 U.S. at 263; *Allen v. Wright*, 468 U.S. 737, 756–57 (1984), *abrogated* on other grounds; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *McFadden v. Bd. of Educ. for Ill. Sch. Dist. U-46*, 984 F.Supp.2d 882, 889–90 (N.D. Ill. 2013); *cf. Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (recognizing that placing a disabled public school student in an improper educational setting is an injury in fact).

[3] Galban attached two exhibits to her amended complaint: her written agreement with IES Abroad, ECF No. 33 Ex. A, and IES Abroad's invoice for her semester abroad experience, ECF No. 33 Ex. B. A Rule 12(b)(6) motion "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is (continued on next page)

*Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (citations omitted); *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 878 (7th Cir. 2012). Rule 8(a)(2) requires a complaint to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion, a pleading must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted).

On a Rule 12(b)(6) motion, the court must "accept all well-pleaded facts from the [complaint] as true and view them in the light most favorable to the plaintiff." *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 973 n.2 (7th Cir. 2021) (en banc) (citing *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021)). This principle "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### B. Governing Legal Principles

To state a breach of contract claim under Illinois law, Galban must plausibly plead "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) damages." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883 (7th Cir. 2022) (citing *Babbitt Muns., Inc. v. Health Care Serv. Corp.*, 2016 IL App (1st) 152662, ¶ 27). IES Abroad contests the first element in its motion to dismiss. The

---

subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 751 (7th Cir. 2012) (citing Fed. R. Civ. P. 10(c) and *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986)). The court considers the exhibits to Galban's amended complaint because she expressly incorporates them. *See* Am. Compl. 34, 59.

parties' arguments raise questions concerning contract interpretation and incorporation by reference of another document into a contract.[4]

A contract may be "either express or implied-in-fact." *Id*. (citation omitted). To be enforceable, "[a]n implied-in-fact contract must contain all the elements of an express contract, but unlike an express contract or other contracts, its terms are inferred from the conduct of the parties." *Id*. (citing *Marcatante*, 657 F.3d at 440). Galban alleges in her amended complaint that she and members of the putative class "entered into an implied contract with Defendant IES Abroad for a 17-week study abroad Program to take place in-person and outside of the United States 2020 Spring Semester (January 13, 2020 to May 9, 2020)." Am. Compl. ¶ 58. She makes clear, however, that she does not mean that IES Abroad's website and written material themselves created an enforceable contract independent of the written agreement she signed with IES Abroad. *See* Am. Compl. ¶ 59. Instead, she pleads that the written contracts she and class members signed "incorporate by reference Defendant IES Abroad's marketing, brochures, circulars, and publications for its 2020 Spring Study Abroad Programs, which are collectively the terms of the Contract between IES Abroad and its students." Am. Compl. ¶ 59.

IES Abroad agrees that the terms of Galban's written agreement, Am. Compl. Ex. A, are enforceable. Mem. Supp. Mot. to Dismiss Am. Compl. 13–14. It parts company with Galban on the issue of incorporation by reference. *See id*. at 14–16. IES Abroad also points to provisions of the written agreement that it claims plainly preclude Galban from recovering, regardless of whether the agreement incorporates IES Abroad's publications by reference. *See id*.

---

[4] Paragraph 32 of the agreement states in part: "I agree that if any dispute concerning my participation in the Program arises that cannot be settled through negotiation, I will first try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures in Cook County, Illinois before resorting to adjudication in a court of law or any other dispute resolution procedure." ECF No. 33-1 at 6. "Enforcement of a forum selection clause (including an arbitration clause) is not jurisdictional; it is a waivable defense . . . ." *Auto. Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 740 (7th Cir. 2007); *see id*. at 746–47. Neither party here references ¶ 32, and neither asks the court to compel mediation. The court therefore implies no view on whether or in what circumstances ¶ 32 requires mediation.

11

"In Illinois, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law." *Beach Forwarders, Inc. v. Serv. By Air, Inc.*, 76 F.4th 610, 613 (7th Cir. 2023) (brackets omitted) (quoting *Horne v. Elec. Eel Mfg. Co.*, 987 F.3d 704, 718 (7th Cir. 2021)). The court's task when interpreting a contract "is to ascertain the parties' intent." *Id*. (quoting *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 267 (7th Cir. 2016)). "The 'starting point of any contract analysis is the language of the contract itself.'" *Horne*, 987 F.3d at 716 (quoting *Avery v. State Farm Mut. Ins. Co.*, 835 N.E.2d 801, 821 (Ill. 2005)). In performing this analysis, a contract must be "construed as a whole, viewing each part in light of the others." *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (citing *Gallagher v. Lenart,* 874 N.E.2d 43, 58 (Ill. 2007)); *accord. Horne,* 978 F.3d at 718 (citing *Matthews v. Chi. Transit Auth.*, 51 N.E.3d 753, 776 (Ill. 2016)).

### C. Incorporation by Reference of IES Abroad's Publications

"Under Illinois law, a contract may incorporate by reference all or part of another document if it 'show[s] an intention to incorporate the document and make it part of the contract.'" *Cage v. Harper*, 42 F.4th 734, 738 (7th Cir. 2022) (brackets in original) (quoting *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002)). As the party seeking to enforce the terms of an incorporated document, Galban bears the burden to demonstrate "an intention to incorporate the document and make it a part of the contract." *Id*. (quotation omitted). An intention to incorporate another document must be "clear and specific," as where "that intention is clearly shown on the face of the contract." *188 LLC,* 300 F.3d at 735–36 (quoting *Jago v. Miller Fluid Power Corp.*, 615 N.E.2d 80, 82 (Ill. App. Ct. 2d Dist. 1993)).

IES Abroad argues that the agreement's merger clause precludes a finding of incorporation by reference. The merger clause reads: "This agreement represents my complete understanding with IES Abroad concerning IES Abroad's responsibility and liability for my participation in the Program, supersedes any previous or contemporaneous understandings I may have had with IES Abroad on this subject, whether written or oral, and cannot be changed or amended in any way without my written agreement." Agreement at 6 ¶ 31, ECF No. 33-1. "The

12

presence of a merger clause is strong evidence that the parties intended the writing to be the complete and exclusive agreement between them." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 665 (7th Cir. 2002) (brackets omitted) (quoting *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 569 (7th Cir. 1993)). But evidence does not mean conclusive proof. Notwithstanding the presence of a merger clause, language elsewhere in a contract may show an express intention to incorporate by reference. *See ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995); *cf. Rosenblum*, 299 F.3d at 666. The court therefore looks to the contractual provisions Galban cites. Galban begins with the first two paragraphs of the agreement:

> I am a student and have agreed to participate in Institute for the International Education of Students' international studies program. In consideration for being permitted to participate in the IES Abroad Program to which I have been accepted ("the Program"), I hereby agree and represent that:
>
> 1. I have received and read IES Abroad published descriptions for the program I will attend and have duly informed myself about the IES Abroad center(s) I will attend and the Program IES Abroad conducts there. . . .

Agreement at 2.

Generally speaking, merely referencing another document or stating that the signer "has read" another document does not suffice to incorporate it by reference. *See Leszanczuk v. Carrington Morg. Servs., LLC*, 21 F.4th 933, 937–38 (7th Cir. 2021); *188 LLC*, 300 F.3d at 777–78; *see also Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 715 (7th Cir. 2019). The agreement in the case at bar does more than merely reference other documents. Paragraph one says that Galban both read and "informed" herself concerning the publications and the program in which she was enrolled. Agreement at 3.

The question therefore becomes whether the language stating that Galban "read" and "informed" (a synonym of "understood") herself about IES Abroad's publications is sufficient to incorporate them. A contractual recital that a party "read and understood" another document has been held to incorporate that document by reference. *See, e.g., Janiga v. Questar Capital Corp.*, 615 F.3d 735, 743 (7th Cir. 2010) (signer "read and understood" incorporated document containing arbitration clause); *see also Matricciani v. Am. Homeowner Pres., Inc.*, 2024 WL

13

730423, at *3 (N.D. Ill. Feb. 22, 2024); *Thompson v. AT&T Servs., Inc.*, 2018 WL 4567714, at *5–6 (N.D. Ill. Sept. 24, 2018). However, Illinois courts have consistently affirmed that "there are no 'magic terms' that are required to incorporate another document by reference." *Ward v. Hilliard*, 116 N.E.3d 1011 (Ill. App. Ct. 5th Dist. 2018), ¶ 47 (collecting cases). Thus, despite a read and understood' recital, specific language elsewhere may indicate that the parties did not intend to incorporate by reference, as where the referenced document states that it is a separate contract. *See Bd. of Managers of Chestnut Hills Condo. Ass'n. v. Pasquinelli, Inc.*, 822 N.E.2d 12, 17 (Ill. App. Ct. 1st Dist. 2004).

As Illinois law requires, the court looks to the agreement as a whole to determine whether the parties intended to incorporate IES Abroad's publications by reference. "When the contract incorporates a specific document by name, both parties are on notice and are bound by the terms of that document." *188 LLC*, 300 F.3d at 737 (citing *J.M. Process Sys., Inc. v. W.L. Thompson Elec. Co.*, 578 N.E.2d 264, 267 (Ill. App. Ct. 1st Dist. 1991); other citations omitted). For example, in *Cage*, the contract at issue stated that certain regulations "governed." *Cage,* 42 F.4th at 738–39. Applying Illinois law, the Seventh Circuit ruled that this language incorporated the regulations by reference. *Id.* The agreement here explicitly references IES Abroad's publications in the following paragraphs:

> 3.      I understand that, although IES Abroad will attempt to maintain the Program as described in its publications and brochures, it reserves the right to change the Program, including the itinerary, travel arrangements, or accommodations, at any time and for any reason, with or without notice, . . . . Agreement at 2.
>
> * * * *
>
> 18.
>
> * * * *
>
> (b) I agree to pay a Program fee on invoice to IES Abroad for such academic, travel, meal, and other arrangements and services as are provided in the Program. . . .
>
> (i)      I understand that the Program fee paid to IES Abroad includes:
>
> (1)      Tuition . . .
>
> (2)      Meals as specified in IES Abroad publications; *Id.* at 4.

\* \* \* \*

29. I agree that the provisions of this agreement shall automatically be extended should I enroll at the same Center in a subsequent semester. The fees for the additional semester are detailed in IES Abroad publications for the Program that I will attend or in a supplementary fee schedule. Split year students (students attending two different IES Abroad programs in two consecutive terms) may be required to complete an additional Form of Agreement for the second term in IES Abroad's sole discretion. *Id.* at 6.

Similar to the contract in *Cage*, the written agreement here expressly references IES Abroad's publications as supplying key terms. *See also Straits Fin. LL v. Ten Sleep Cattle Co.*, 900 F.3d 359, 369 (7th Cir. 2018). Paragraphs 3 and 18(b) both say in so many words that IES Abroad's publications specify the important terms of the program IES Abroad agrees to provide, terms such as the meals, itinerary, and housing accommodations. *See* Agreement at 2, 4. Paragraphs 18(b) and 29 also reference IES Abroad's publications as supplying the program's price.

In sum, when the written agreement is read as a whole, it becomes clear that the parties manifested an objective, mutual intent to incorporate IES Abroad's publications to supply terms of their contract. Indeed, if the publications were not incorporated by reference, terms as fundamental as the price Galban agreed to pay, her lodging, and her meals, would not be specified in the contract. For these reasons, the court concludes that the written agreement incorporates IES Abroad's publications by reference.

### D. "No Refund" Clauses

IES Abroad contends that, regardless of incorporation, the following contractual provisions insulate it from liability stemming from the change to remote learning in March 2020:

20.

\* \* \* \*

(b) I agree that should I withdraw from or be expelled from the Program at any time on or after the date the full payment is due but prior to the start date of the Program, refund of the unused, unexpended or uncommitted portion of the Comprehensive Fee that I have paid shall be made in accordance with the refund policy of IES Abroad. In sum, refunds will be made only on recoverable costs, less the IES Abroad Confirmation Deposit Fee. I understand that on or after the arrival date there will be no refunds. After the arrival date for my Program, I may appeal for a partial refund only in the event of a serious illness or emergency that requires

15

> me to return home. The amount of my refund in this event will be determined on the basis of recoverable costs and at the sole discretion of IES Abroad at the time of my withdrawal.
>
> \* \* \* \*
>
> 21.   I further understand that IES Abroad shall make no refund in any event for any unused services such as tuition, field trips and housing, etc. while I am enrolled in the Program.

Agreement at 4–5.

IES Abroad seizes upon the sentence in the middle of ¶ 20(b): "I understand that on or after the arrival date there will be no refunds." As IES Abroad reads it, this sentence exculpates it from liability because Galban and members of the putative class had enrolled in their programs when IES Abroad switched to remote learning in March 2020.

As Galban argues, however, IES Abroad focuses too narrowly on a single sentence in ¶ 20(b). The very next sentence partially contradicts it: "After the arrival date for my Program, I may appeal for a partial refund only in the event of a serious illness or emergency that requires me to return home." If the sentence IES Abroad quotes meant that refunds are never available after a student arrives regardless of the reason, then the following sentence and all of ¶ 21 would be redundant: "IES Abroad shall make no refund in any event for any unused services such as tuition, field trips and housing, etc. while I am enrolled in the Program." *Id*. ¶ 21.

Ultimately, IES Abroad's reading of ¶ 20(b) fails to persuade because "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." *Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC - Arlington Place One*, 20 F.4th 359, 371 (7th Cir. 2021) (quoting *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011)).

When interpreting a contract, "[T]he principle of noscitur a sociis—a word is known by the company it keeps—[is used] to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words . . . .'" *Citizens Ins. Co. of Am. v. Wynndalco Enters., LLC*, 70 F.4th 987, 1004 (7th Cir. 2023) (brackets in the original; alterations omitted) (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015)). The first and last sentence of ¶ 20(b) both

confirm that expulsion or student-initiated withdrawal trigger the specific refund policy described in that paragraph. *See* Agreement at 5, ¶ 20(b). That context limits the scope of the sentence stating that no refunds will be issued, thereby avoiding surplus language in the agreement. *See id*. Similarly, ¶ 21 declares that IES Abroad "shall make no refund in any event for any unused services such as tuition, field trips and housing, etc." *Id.* Read in isolation, that would seem to preclude all refunds, again making portions of ¶ 20 into contractual window dressing. But ¶ 21 can be limited to its express context: "while I am enrolled in the Program." *Id*. Read in this context, ¶ 21 applies only to claims for a refund made while a student is enrolled but says nothing about post-enrollment claims.

Construed in context, then, ¶¶ 20 and 21 do not preclude recovery for the breach of contract claim alleged in the amended complaint. Galban does not allege that she was expelled from the program, and she does not allege that she sought a refund while she was enrolled in the program.

### E. Reservation of Right to Change the Program

IES Abroad grounds its second and final contractual argument on ¶ 3 of the agreement:

> 3. I understand that, although IES Abroad will attempt to maintain the Program as described in its publications and brochures, it reserves the right to change the Program, including the itinerary, travel arrangements, or accommodations, at any time and for any reason, with or without notice, and that neither IES Abroad, nor its officers, directors, contractors, affiliates, agents and employees shall be responsible or liable for any expenses or losses that I may sustain because of these changes.

Agreement at 3, ¶ 3.

IES Abroad reads ¶ 3 broadly as covering Galban's claims. Galban disagrees. She observes that the written agreement could have, but did not, contain a force majeure clause. Resp. to Mot. to Dismiss Am. Compl. 12, ECF No. 39. Galban distinguishes between a "change" authorized by ¶ 3 on the one hand and "suspension" or "cancellation" of the "central component" of the program due to a force majeure event on the other. *See id*. at 12–13.

Galban cites two cases in support of her argument. *See id.* First, the Seventh Circuit's opinion in *Gociman v. Loyola University of Chicago*, 41 F.4th 873, 884–87 (7th Cir. 2022),

makes no reference to a reservation of rights clause. Rather, the question was whether the complaint plausibly alleged the existence of a contract implied in fact. *See id.* The second case Galban cites, *Shaffer v. George Washington University*, 27 F.4th 754 (D.C. Cir. 2022), comes closer to the issue here. In *Shaffer*, the D.C. Circuit considered language in George Washington University's course catalogs reserving the right to change courses and programs with or without notice. *See id.* at 764–65. In holding that this reservation language did not get the university off the hook for a breach of contract claim similar to Galban's, the *Shaffer* court stated that the course catalog did "not specifically address emergencies or other force majeure events. In particular, it says nothing about allocating the financial risk of those events to the students." *Id.* at 764–65. Here, by contrast, ¶ 3 of the agreement expressly allocates financial risk: "[N]either IES Abroad, nor its officers, directors, contractors, affiliates, agents and employees shall be responsible or liable for any expenses or losses that I may sustain because of these changes." Agreement at 3. The presence of this language distinguishes *Shaffer.*

For its part, IES Abroad relies primarily on *Zhao v. CIEE Inc.,* 3 F.4th 1 (1st Cir. 2021). Like Galban, Zhao, a Harvard student enrolled in a study abroad program, sued for breach of contract because the defendant cancelled its study abroad program in March 2020 when the COVID-19 pandemic broke out. The contract's cancellation clause read: "If an emergency requires that a program be canceled following the program start date and prior to the end of an academic term, CIEE will make reasonable efforts to make alternative arrangements in order to allow students to complete their academic work, but cannot guarantee that full or partial credit will be obtained." *Id.* at 6. The First Circuit held that the foregoing cancellation clause precluded the student's breach of contract claim. *See id.*

Plaintiff is correct that, unlike in *Zhao*, the contract in the instant case does not explicitly use the word "cancel" or similar language. Nonetheless, at least two decisions in this district have enforced language similar to ¶ 3 and dismissed a student's lawsuit alleging that the plaintiff's university breached its contract by switching to online learning in March 2020. In the first case, *Polley v. Northwestern University*, 560 F.Supp.3d 1197 (N.D. Ill. 2021), a group of

18

current and former Northwestern University students sued their school for breach of contract and unjust enrichment based on its transition to online learning in March 2020. The court dismissed the complaint, citing, among other things, the following language in Northwestern's course catalog: Northwestern "reserves the right to change without notice . . . any statement in this catalog concerning, but not limited to, rules, policies, tuition, fees, curricula, and courses" and that the registration and academic program policies are "subject to change without notice." *Id*. at 1209 (quoting undergraduate and graduate course catalogs). Citing that reservation, the court held that "no student could interpret the lists and descriptions of classes as an offer creating a guaranteed entitlement." *Id*.

The plaintiff in *Miller v. Lewis University*, 533 F.Supp.3d 678, 685 (N.D. Ill. 2021), brought a similar breach of contract claim against a university in Romeoville, Illinois. In addition to citing the college's website and publications, the plaintiff argued that her spring 2020 schedule formed an implied contract obligating the university to provide in-person instruction. *See id*. at 685–86. The court quoted the following reservation on the plaintiff's course schedule: the university reserves the right to "make any schedule changes required including change of class time, location or instructor." *Id*. at 686 (citation omitted). Judge Kennelly, who authored *Miller*, disagreed with the plaintiff's argument that this language was ambiguous and should therefore be construed against the drafter (the university). *See id*. at 686–87 (citing *Drennan v. Ind. Harbor Belt R. Co*., 2001 WL 883659, at *4 (N.D. Ill. Aug. 6, 2001)). "There is," he wrote, "nothing the least bit ambiguous about the language of the reservation allowing Lewis to make unilateral changes." *Id*. at 687.

At the risk of excess repetition, paragraph three reserves to IES Abroad the "right to change the Program, including the itinerary, travel arrangements, or accommodations, at any time and for any reason." Agreement ¶ 3. That language sweeps as broadly as the reservations held to be unambiguous in *Polley and Miller*. Regarding Galban's argument that the agreement here does not expressly reference cancellation, it "did not need to" because "[t]he word 'including,' of course, typically denotes a non-exhaustive list." *Miller*, 533 F.Supp.3d at 686.

19

Like the clauses in *Polley and Miller*, ¶ 3 unambiguously reserves to IES Abroad the right to change how instruction is delivered. Accordingly, Galban's breach of contract claim is dismissed.

### F. Unjust Enrichment Claim

As she is permitted to do, *see* Fed. R. Civ. P. 8(c)(1), Galban pleads her unjust enrichment claim in the alternative to her breach of contract claim. Unjust enrichment is an equitable remedy. "[T]he remedy of unjust enrichment is unavailable 'where there is a specific contract that governs the relationship of the parties.'" *Miller*, 533 F. Supp. 3d at 687 (quoting *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. 3d Dist. 2005)). Here, Galban does not dispute that a contract governed her relationship with IES Abroad. Having dismissed her breach of contract claim, Galban's unjust enrichment claim must also be dismissed. *See Polley*, 560 F.Supp.3d at 1069; *see also Miller*, 533 F.Supp.3d at 687.

### IV. Conclusion

For the reasons stated, defendant's motion to dismiss the amended complaint is granted.

Dated August 26, 2024　　　　　　　　　　　　　　　/s/ Joan B. Gottschall
　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge